## *Ex parte* HIBBS.

*(District Court, D. Oregon.* ⸱February 4, 1886.)

1. CRIMINAL LAW—INDICTMENT—JOINDER OF OFFENSES—TRIAL AND PUNISHMENT THEREFOR.

When two or more distinct offenses are joined in one indictment, under section 1024 of the Revised Statutes, or two or more indictments therefor are consolidated, the jury may find the defendant guilty of one charge and not of another, and may find a verdict as to one or more of the charges, and be discharged from the consideration of the remainder, on which the defendant may be thereafter tried as if a jury had not been impaneled in the case; and the defendant may be sentenced to receive the maximum punishment for each offense or charge of which the jury may find him guilty.

2. EXTRADITION—WARRANT OF EXTRADITION—INTERPRETATION OF.

A warrant of extradition allowed by the Dominion government, under the tenth article of the treaty of 1842 with Great Britain, recited that the party was accused of the crime of forgery, and had been committed for extradition thereon. without saying what forgery. *Held,* that resort might be had to the proceedings before the committing magistrate, and his report, on which the warrant issued, to ascertain what and how many forgeries the extradition was intended to apply to or include.

3. SAME—FOR WHAT CRIME AN EXTRADITED PERSON MAY BE TRIED.

The treaty aforesaid is not only a contract between the government of Great Britain and the United States, but it is also the law of this land; and a person extradited under it cannot be detained or tried here for a crime, unless enumerated therein and included in the warrant of extradition; and he may, if occasion require, invoke the treaty in any judicial proceeding as a protection against such detention or trial.

4. Forgery—What Constitutes.

The postmaster at Lewiston, Idaho, issued a postal money order on the application of a fictitious person, without consideration therefor, payable to a certain bank, to which he at the same time wrote in the name of such person, directing that the amount of the order be collected and remitted to him at Pierce City, in a registered package, which he intercepted as it passed through his office, and converted the contents to his own use. *Held*, that the act of the postmaster constituted forgery, both at common law and under the statute of the United States. Section 5463, Rev. St.

On *Habeas Corpus*.

*Frank Ganahl, Richard Williams,* and *George Burnett,* for prisoner.

*James F. Watson* and *James H. Hawley,* for defendant.

DEADY, J. On December 19, 1885, a writ of *habeas corpus* was allowed by me, directed to Fred. Dubois, and returnable before this court on December 24th, commanding him then and there to produce the body of Isaac N. Hibbs, together with the cause of his capture and detention. The writ was allowed on the petition of Ella Hibbs, the wife of the prisoner, alleging substantially that in July last said Hibbs was unlawfully delivered to John J. Murphy, a post-office inspector of the United States, by "the authorities of British Columbia," on a pretended warrant of extradition, wherein he was charged with the crime of forging a certain postal money order, 22,768, and by said Murphy conveyed to Lewiston, Idaho, where he was indicted for said crime, and "duly acquitted thereof," but that said Dubois has nevertheless taken said Hibbs into his custody, and is transporting him to Decatur, Illinois, there "to be tried upon an alleged and pretended charge of uttering forged money orders," which crime is not mentioned in said pretended warrant of extradition; that the petitioner is unable to ascertain the tenor of the pretended process on which said Hibbs is detained, but she believes and is advised by counsel that the same is illegal, because there is no legal process whatever to authorize the restraint of said Hibbs; and that said Dubois is about to transport said Hibbs through the county of Umatilla, in this district, *en route* to Iowa.

The writ was served on Dubois on December 21st, as he was passing through Umatilla county with Hibbs in his custody, and, by an arrangement between counsel, he had until January 4th to produce the body and make his return to the writ, at which time an order was made committing Hibbs to the jail of this county pending the proceeding. Owing to the great delay in getting copies of papers from Victoria and Lewiston, the proceeding, by consent of counsel, was delayed from time to time, so that the return was filed on the seventh inst., and the reply thereto on the 15th. The case was heard on the fifteenth, sixteenth, and eighteenth inst., and during the argument, by consent of counsel, copies of the complaint before the committing magistrate at Victoria, in British Columbia, under the Canadian "extradition act of 1877," together with his "judgment" and certificate of committal to the minister of justice of the Dominion government,

and the record of the proceeding in *U. S. v. Hibbs*, in the district court, at Lewiston, were put in evidence, with the understanding that the facts stated therein should have weight in the consideration and determination of the case according to their legal effect.

From the pleadings and papers, it appears that on July 27, 1885, Mr. John J. Murphy, a postal inspector of the United States, made a complaint at Victoria, in British Columbia, before Hon. Mr. Justice Crease, of the supreme court of said province, under the Canadian extradition act of 1877, in which he accused the prisoner, Isaac N. Hibbs, of the crime of forging and uttering, at Lewiston, Idaho, while acting as postmaster thereat, postal money order 22,768, with intent to defraud the United States; and on July 29th made another complaint under said act before said justice, in which he accused said Hibbs of forging and uttering at the same place, and while so acting as postmaster, 35 other postal money orders, numbered between 22,647 and 22,810, both inclusive, with intent to defraud the United States; that said orders were drawn on the ninth, tenth, and eleventh of April, 1885, for the sum of $100 each; six of them being drawn on each of the following offices: Leadville, Colorado; Decatur, Illinois; Kearney, Nebraska; Lake City, Minnesota; Plankington, Dakota; and Nebraska City, Nebraska; and that said Hibbs, on May 2, 1885, did forge the name of J. G. Wilson on the backs of three drafts, dated April 24, 1885, and drawn by the National Bank of Nebraska City on the National Bank of Omaha in favor of said Wilson for $200 each, which drafts were so issued in payment of the six orders drawn by Hibbs on the office at Nebraska City, and were thereafter negotiated by him through the National Bank at Lewiston. After an examination of the case Mr. Justice Crease held the prisoner for extradition under the tenth article of the treaty of August 9, 1842, with Great Britain, on all the charges made against him, as appears by "the judgment" which he then delivered and refers to in his report to the minister of justice; and on July 31st he issued a warrant committing Hibbs to the common jail of Victoria, "on the ground of his being accused of the crime of forgery within the jurisdiction of the United States of America," until duly discharged.

From this "judgment" it also appears that Hibbs, as postmaster, wrote letters of advice to the postmasters at the several offices on which these orders were drawn, informing them that the same were purchased by J. G. Wilson or W. H. Dent, fictitious persons, so far as appears, and were payable to certain banks, naming them, to which latter he, at the same time, wrote letters, in the name of such purchaser, inclosing the orders, and asking that they be collected, and the funds remitted to the writer in a registered letter, directed to Pierce City, Idaho, which being done, the packages passed through his office, at Lewiston, and were taken out by him, and the contents converted to his own use; that no application was made for any of these orders,

and no money paid for any of them; and that the prisoner confessed, when arrested, to having obtained by this means over $20,000.

On September 10, 1885, a warrant for the extradition of Hibbs was issued by the minister of justice, addressed to the keeper of the common jail at Victoria and to J. J. Murphy. It recites that Isaac Newton Hibbs, accused of the crime of forgery within the jurisdiction of the United States of America, "was delivered into the custody of said keeper by the warrant of Mr. Justice CREASE, aforesaid, to await his surrender to the United States of America," and that an application for a writ of *habeas corpus*, made to the supreme court of British Columbia by said Hibbs, was refused, and commands said keeper to deliver Hibbs to the custody of said Murphy, and the latter to receive him, and convey him within the jurisdiction of the United States, and there place him in the custody of any person appointed thereby to receive him. That thereafter the said keeper, pursuant to said warrant, delivered said Hibbs to said Murphy, who thereupon conveyed him to Lewiston, and there delivered him into the custody of the proper authority for trial on said charge in the district court for Nez Perces county, Idaho; but it does not appear that said Murphy ever had said warrant of extradition in his possession, or that the same is on file in the clerk's office of said court. That on November 20, 1885, the grand jury of said district court found four indictments against Hibbs, thereby accusing him of the crime of forging, at Lewiston, on April 10, 1885, four certain postal money orders for the sum of $100 each, and of uttering one such order, with intent to defraud the United States, as follows: No. 1, for forging order 22,773; No. 2, for forging order 22,768; No. 3, forging order 22,770, and for uttering the same, well knowing that it was forged; No. 4, forging order 22,771, and a letter of advice thereabout of the same number, to the postmaster at the office on which said order was drawn, stating that the same had been purchased by J. G. Wilson, and was payable to the national bank at that place,—Decatur, Illinois,—it being also alleged in indictments 1 and 2 that the defendant therein falsely signed and issued a letter of advice in each of said cases, of the same number as the order mentioned therein, stating that the purchaser of the same was J. G. Wilson, and that it was issued in favor of the national bank at Decatur, Illinois.

On the same day a bench-warrant was issued on each of these indictments, indorsed, "Admit to bail in the sum of $3,000," on which Hibbs was brought into court and arraigned, when a plea to the jurisdiction in indictment 1 was interposed, which was argued and considered as a plea to the other three indictments also, to the effect that the indictments in each case charged a crime for which the defendant was not extradited; which plea set forth the circumstances of the arrest and extradition of Hibbs from British Columbia substantially as above stated, but averred that the charge on which he was arrested and extradited was the forging and uttering of order 22,768, and no

other. The court overruled the plea; whereupon a demurrer was filed to one of the indictments on the grounds (1) that it charged more than one offense; and (2) that the facts stated did not constitute any offense,—which was argued and considered as a demurrer to all four of the indictments, and overruled by the court. On December 8th the plea of "not guilty" was entered in each case, and, by consent of counsel, indictments 2, 3, and 4 were ordered "consolidated for the purposes of a trial thereon," which commenced on the following day, and ended on the 16th, with a verdict of not guilty, as charged in the indictment, "of uttering order 22,770," or "of forging order 22,771;" and a statement that the jury were unable to agree on the charge in indictment 2, for forging order 22,768,—which verdict was received, and the jury discharged from the further consideration of the case, and "the prisoner was remanded to custody." On the following day the court denied a motion to reduce the bail, and made an order allowing the district attorney to submit to the next grand jury "twenty-seven other charges standing against the defendant, as appears by the original complaint on file herein, and the plea to the jurisdiction of the court."

Fred. T. Dubois, the defendant in this proceeding, is the United States marshal for Idaho, to whom the bench-warrants aforesaid were directed and delivered, being issued, as he avers, "by and under the hand of the Hon. NORMAN BUCK, associate justice of the supreme court of Idaho," and which are still in his possession, and by virtue of which he claims to detain the prisoner. He also avers that on December 21st, pursuant to an order of the attorney general of the United States, he took Hibbs from the jail at Lewiston for the purpose of conveying him to the penitentiary at Boise, Idaho, for safe-keeping therein, pending his trial on the indictments aforesaid, and, while diligently and in good faith conveying said Hibbs to said prison, he was required to pass through a portion of Umatilla county, Oregon, where he was served with the writ of *habeas corpus* as aforesaid. But the order of the attorney general appears to have been made before the extradition took place. It is dated July 13th, and was made in response to a letter from the marshal, of June 22d, in which he states the insecurity of the jail at Lewiston, and suggests, in the event of Hibbs' extradition, that he be taken to the prison at Boise. The order provides:

"You will cause said Hibbs, if he is extradited, and delivered to you, to be taken to the penitentiary at Boise City, Idaho, for confinement therein while awaiting his trial, which I understand cannot take place until the November term."

This court has no supervisory power over the district court of Idaho, and will not, therefore, undertake to inquire into the legality or correctness of its proceedings in a matter within its jurisdiction.

This writ was allowed on the allegation in the petition that the defendant was removing the prisoner to another jurisdiction, for the

purpose of subjecting him to a trial on a charge not embraced in the warrant of extradition. But it now appears that the prisoner was not being conveyed beyond the limits of Idaho for any purpose, but only to a secure place of confinement therein. Therefore the question of whether these bench-warrants are *functi officiis,* because only issued to bring the prisoner into court to answer to the indictment; or whether the order of the court remanding the prisoner to custody, after the trial on the three indictments, is not itself sufficient authority for the detention of the prisoner; or whether the marshal, under section 1876 of the Revised Statutes, making him the executive officer of the territorial court in a case where the United States is a party, is not the person to execute that order; or whether he might not do so by confining the prisoner in the penitentiary at Boise, under section 1892 of the Revised Statutes, as amended by the act of June 20, 1874, (18 St. 112,) putting that prison under the care and control of the marshal of the territory, independent of any direction from the attorney general, for which it does not appear that the statute makes any provision in case of a prisoner merely detained for trial, unless implied in the provisions of section 362 of the Revised Statutes,—will not be considered or decided in this proceeding. It being now conceded that the prisoner is not being conveyed beyond the jurisdiction of the territorial court, so far as these points are concerned, the case will be considered as one where the prisoner may and should seek relief in that court for any detention or restraint caused by or resulting from the use or application of its process or orders after the same have fulfilled their function or served their purpose, or the prisoner for any reason is entitled to be discharged from custody thereunder. Hurd, Hab. Corp. c. 6, §§ 1–3.

On the argument a point was made by counsel for the prisoner that the effect of the trial and verdict on the consolidated indictments 2, 3, and 4 was equivalent to a verdict of not guilty generally; that the prisoner, being extradited for the crime of forgery only, and but one forgery, he cannot be held, under the treaty, for trial on any other or further charge of forgery. At common law two or more distinct offenses may be joined in one indictment, in separate counts, when they are of the same general character, and admit of the same mode of trial, and are subject to the same species of punishment. Whart. Crim. Pl. & Pr. §§ 285, 294. These indictments were consolidated under the last clause of section 1024 of the Revised Statutes, which authorizes the joinder in one indictment of "several charges against any person for the same act or transaction, or for two or more acts or transactions connected together," or of two or more distinct crimes of the same class "which may properly be joined;" and provides that if separate indictments are found in such cases the court may order them consolidated.

In cases arising out of the same act or transaction, or two or more acts or transactions connected together, where there are several

counts in the indictment, it will depend on the circumstances of the case whether, on a general verdict of guilty as charged in the indictment, the defendant may be sentenced to more than the maximum punishment for one of the offenses charged. But in the case of two distinct offenses arising out of two distinct acts or transactions, however closely related in point of time or place, the trial is for distinct offenses, of which the defendant may be found guilty and receive the maximum punishment for each; and in either case the jury may find a verdict of guilty as to one count, and not guilty as to another, or they may find a verdict as to one count, and, being unable to agree as to the other, they may be discharged, and the party held for trial on the latter count. *U. S.* v. *Davenport,* Deady, 264; *Ex parte Peters,* 4 Dill. 169; *U. S.* v. *Scott,* 4 Biss. 29; *U. S.* v. *O'Callahan,* 6 McLean, 596; Whart. Crim. Pl. & Pr. § 910; 1 Bish. Crim. Law, §§ 1060, 1062; *U. S.* v. *Wentworth,* 11 Fed. Rep. 52.

The act authorizing the joinder of offenses in one indictment and the consolidation of separate indictments for distinct offenses was intended to promote the speedy and economical administration of justice in such cases, in the interest both of the government and the defendant, and not practically to merge two or more distinct offenses into one, for the benefit of the latter. Nor is there any reason why a party who has committed two distinct offenses, which, for the convenience of the prosecution as well as the defense, are joined in one indictment, can only be punished as for one, though found guilty of both. Whart. Crim. Pl. & Pr. § 910. But it is still in the discretion of the court, notwithstanding the statute, to say what offenses may be properly joined or indictments consolidated, without injustice or prejudice to the defendant.

In this case the charges are so similar, and the facts so few, that probably the whole 39 charges against the prisoner might properly and conveniently be joined in one indictment. That such joinder might curtail the privilege of taking peremptory challenges to the jury is not material to consider; for it would operate, in this respect, on the prosecution and defense alike. No one has any vested right to peremptory challenges, and congress may diminish or forbid them altogether.

On the argument the senior counsel for the prisoner pressed this point, and cited and relied on *People* v. *Liscomb,* 60 N. Y. 559, as establishing the general doctrine that a joinder of offenses has the practical effect of fusing the whole into one crime, for which the defendant cannot be sentenced beyond the maximum punishment therefor, even when the jury find a separate verdict of guilty on each count. There were some peculiar circumstances in this case; but I am inclined to agree with Dr. Wharton (Crim. Pl. & Pr. § 910) that it is not likely to become a precedent elsewhere.

According to my impression of the law, the verdict in *U. S.* v. *Hibbs* disposed of indictment 4 and left 2 for trial as if a jury had not been

impaneled therein. But indictment 3 is in a peculiar condition. It contains two counts: one for forging, and the other for uttering, order 22,770. The jury found the prisoner not guilty of the "uttering," and said nothing as to the forgery. A verdict of guilty on one count, and silence as to another, is generally considered equivalent to a verdict of not guilty as to the latter. Whart. Crim. Pl. & Pr. § 740. But whether the converse of this proposition will hold good is doubtful, but not necessary to decide. No judgment was entered on the verdict, nor does any appear to have been asked for. In any view of the matter, then, there are two indictments—1 and 2 —pending against the prisoner in the district court of Nez Perces county, charging him with the commission of distinct forgeries prior to his extradition. In addition to these, there are 27 other charges of forgery against him, which the district attorney has leave to submit to the next grand jury.

But counsel for the prisoner insist that on the face of the warrant the prisoner appears to have been extradited for one forgery only, without specifying what one, which must therefore be taken to be the one for which he was tried and found not guilty; and, assuming that the prisoner cannot legally be held or tried for any offense other than the one for which he was extradited, counsel claim that the prisoner is now illegally restrained of his liberty under process of the territorial court, which, under no circumstances compatible with the facts and inferences of this argument, can any longer be legal or valid, for want of jurisdiction in said court over the offense or the offender. It must be admitted that on the face of the warrant it does not appear that the prisoner was extradited for more than one forgery; and yet he may have been, for anything that appears to the contrary. The warrant simply recites that Hibbs was "accused of the crime of forgery within the jurisdiction of the United States," and that he has been committed by Mr. Justice CREASE for extradition thereon, and authorizes and commands his surrender and extradition accordingly. The writ is ambiguous or indefinite in this particular. The word "forgery" must be interpreted to ascertain whether the warrant was intended to comprehend more than one crime. To do this, the court may consider the circumstances under which it was issued; and these are best shown by a reference to the preliminary stages of the proceeding of which the warrant is but the consummation and end. From these it appears that the prisoner was held by the committing magistrate on 39 distinct charges of forgery, which were certified to the minister of justice for a warrant of extradition thereon. If, under these circumstances, the warrant had been issued for any particular one of these charges only, as the forging of order 22,768, the first one complained of, the only conclusion possible from the premises would be that extradition on the other charges was refused. But as the warrant authorizes the prisoner's extradition on "the crime of forgery," for which he was committed by Mr. Justice CREASE, at

Victoria, "to await his surrender" to the United States, the only reasonable interpretation of the language is that the Dominion government thereby intended and did surrender the prisoner for trial on all the charges of forgery on which he was so committed; and the warrant must be so construed.

But the counsel for the prisoner goes further, and contends that the prisoner cannot be legally held anywhere, or for any purpose, on any process issued on the indictment aforesaid; the same being absolutely void for the reasons: (1) A person extradited under the treaty of 1842 for one offense cannot be charged with or tried for another; (2) the crime charged in the indictments herein is not forgery under the law of the United States,—therefore the prisoner is being held and proceeded against thereon without law, and contrary to the treaty, and warrant of extradition.

The major premise of this argument involves an important and vexed question which must finally be settled by the supreme court. By the tenth article of the treaty with Great Britain of 1842 (Pub. Treat. 320) it is agreed that the parties thereto shall, on mutual requisitions by them, "deliver up to justice all persons who, being charged with the crime of murder, or assault to commit murder, or piracy, or arson, or robbery, or forgery, or the utterance of forged paper, committed within the jurisdiction of either, shall seek an asylum or shall be found within the territories of the other: provided, that this shall only be done upon such evidence of criminality as, according to the laws of the place where the fugitive or person so charged shall be found, would justify his apprehension and commitment for trial if the crime or offense had there been committed." The remainder of the article simply provides in detail for the arrest and surrender of the fugitive, in case "the evidence be deemed sufficient to sustain the charge."

In *U. S.* v. *Caldwell,* 8 Blatchf. 131, (1871,) it was held by Judge BENEDICT that the defendant, although extradited on a charge of forgery, might be indicted and tried on a charge of bribery, and, while in effect admitting that this was an abuse of the extradition proceeding that would constitute a good cause of complaint between the two governments, he decided that such complaints were not a proper subject of investigation in the courts, however much they might regret that they were permitted to arise. In short, he held that the question was not a judicial one, but political, and must be referred to the executive departments of the two governments.

This case was followed by *U. S.* v. *Lawrence,* 13 Blatchf. 295, (1876,) in which Judge BENEDICT adhered to the conclusion reached in *U. S.* v. *Caldwell.*

In *Adriance* v. *Lagrave,* 59 N. Y. 110, (1874,) the court of appeals held that a person brought within the United States on an extradition proceeding, on the charge of burglary, might be arrested therein in a civil action,—two judges, GROVER and FOLGER, dissent-

ing,—and reversed the judgment of the supreme court to the contrary, given by Judges DANIELS, DAVIS, and BRADY, thus leaving the judicial utterance of the state on the subject as six to five.

In *Com.* v. *Hawes*, 13 Bush, 697, (1878,) the defendant was surrendered, under the treaty of 1842, on the charge of forgery committed in Kentucky, for which he was tried and acquitted. He was also indicted for embezzlement in the same court,—an offense for which he could not have been extradited. A motion to put him on trial for this offense was denied by the trial court. On an appeal to the court of appeals, this ruling was affirmed, for the reason, in brief, that by a necessary implication the treaty forbids extradition except on a charge of some one of the offenses enumerated therein, and, being "the supreme law of the land," a party brought into this country for trial under it, had a right to set it up as a defense to a prosecution for any other crime while in custody thereunder.

In *U. S.* v. *Watts*, 8 Sawy. 370, S. C. 14 Fed. Rep. 130, (1882,) the defendant, being arraigned in the United States district court for California on three indictments found therein, pleaded to the jurisdiction that he had been extradited, under the treaty of 1842, for offenses other than those alleged in the indictments; which last are not enumerated in the treaty. Judge HOFFMAN, in a very able opinion, containing an exhaustive review of the authorities, including the opinions of jurisconsults and writers on international law, as well as the legislation and diplomatic correspondence on the subject, came to the same conclusions as the Kentucky court of appeals.

In *State* v. *Vanderpool*, 39 Ohio St. 273, (1883,) the supreme court held that a person extradited under the treaty of 1842 cannot be detained or prosecuted for a different crime, whether included in the treaty or not, than the one for which he was surrendered; and that the treaty, being a part of the law of the land, may be invoked in the courts by any person so detained or prosecuted.

In *Ex parte Ker*, 18 Fed. Rep. 167, (1883,) Judge DRUMMOND, of the United States circuit court for Illinois, refused to issue a writ of *habeas corpus* for the deliverance of the petitioner from custody under process of a court of the state. It appears that Ker, after having been indicted in said state court for larceny, went to Peru, where he was kidnaped and brought back to Illinois, and arrested for trial on said indictments. The grounds on which the writ was refused are not definitely indicated, but it was suggested that the petitioner could set the matter up as a defense to the indictments in the state courts, and, if need be, take the case from there to the supreme court on the question. But it is apparent that the petitioner, not having been brought into Illinois under the treaty with Peru, was not in custody under color of the authority of the United States, or in violation of a treaty thereof, and therefore the United States circuit court did not have any jurisdiction to inquire into the legality thereof. Section 753, Rev. St.; Spear, Extr. 185.

The weight of this array of the authorities is in favor of the proposition that an extradited person cannot lawfully be detained or tried on any charge other than the one on which he was surrendered by the extraditing government.

The treaty of 1842 is not only a contract between the governments of Great Britain and the United States, but by virtue of the constitution of the latter, (article 6,) it is also the supreme law of this land. It contains an explicit enumeration of the offenses for which persons may be extradited under it, and, by a necessary implication, the person surrendered under it is only allowed and held within the jurisdiction of the receiving government for the purpose of trial on the charge specified in the warrant of extradition. For the latter government to detain such person for trial on any other charge would be not only an infraction of the contract between the parties to the treaty, but also a violation of the supreme law of this land in a matter directly involving his personal rights. Field, Extr. 107. A right of person or property, secured or recognized by treaty, may be set up as a defense to a prosecution in disregard of either, with the same force and effect as if such right was secured by an act of congress. And so the prisoner cannot lawfully be detained or prosecuted, under this extradition, for the crime of uttering any of these money orders; for, although he was charged with the crime of uttering them before the committing magistrate in Victoria, he was neither committed nor surrendered on that account, but solely for the crime of forgery.

The only other question in the case is, what is the nature of the crime charged in the pending indictments 1 and 2? It has been determined by the proper authority of Canada to be forgery according to the common law,—the law of that country. To what standard we must look for a definition or interpretation of the word "forgery," as used in the treaty of 1842, may be a question. But in a convention made between two countries like Great Britain and the United States, whose language and laws have a common origin, it is more than probable that the term is used therein in at least as broad a sense as at the common law. There are no common-law crimes against the United States, but terms used in its statutes defining crimes, or making certain acts punishable as such, are, unless the contrary plainly appears, to be taken and interpreted in the common-law sense. A statute of the United States (section 5463, Rev. St.) provides:

"Any person who shall, with intent to defraud, *falsely make*, forge, counterfeit, engrave, or print * * * any order, in imitation of, or *purporting to be*, a money order issued by the post-office department, or of any of its postmasters or agents, or any material signature or indorsement thereon, * * * shall be punished by a fine of not more than $5,000, or by imprisonment at hard labor for not less than two years and not more than five years."

The crime defined in this statute is the common-law crime of forgery, with reference to a postal money order. To "falsely make,

forge, counterfeit, engrave, or print" are all cognate terms, used to define or designate the crime of forgery in some of its many phases. Forgery, at common law, belonged to that class of misdemeanors called "cheats;" but, owing to the serious wrongs and frauds thereby perpetrated, it was distinguished in time by a particular name and a special punishment. Dr. Wharton, (1 Crim. Law, § 653,) citing Blackstone and East, says forgery at common law is "the false making or altering, *malo animo*, of any written instrument." According to Sir James Stephens, (3 Hist. Crim. Law, 186,) the accepted common-law definition of forgery is "making a false document with intent to defraud." Mr. Bishop (2 Crim. Law, § 523) says: "Forgery, at the common law, is the false making or materially altering, with intent to defraud, of any writing which, if genuine, might apparently be of legal efficacy, or the foundation of a legal liability." And, reduced to a briefer form, he puts it thus: "Forgery is the fraudulent making of a false writing which, if genuine, would be apparently of some legal efficacy." The false making of a writing is forging at common law. *U. S.* v. *Wentworth,* 11 Fed. Rep. 55.

The prisoner, as postmaster at Lewiston, was intrusted with public documents designed to facilitate the transfer of small sums of money from place to place, and known as "postal money orders." They were delivered to him in blank, as the agent of the postal department of the government of the United States, for safe-keeping, and with authority to fill up, sign, stamp, and issue any one of them, when applied to in writing for that purpose, and the amount for which it is so filled was paid into his office, and not otherwise. Indeed, it is made a misdemeanor, (section 4030, Rev. St.,) punishable by fine not less than $50 nor more than $500, for a postmaster to issue such an order, under any circumstances, without the previous receipt of the money therefor. The instruments set out in these indictments, and of which the prisoner is thereby charged with forging, purport to be postal money orders of the United States. They were issued without authority, and contrary to the prohibition of law. They were falsely made, filled up, signed, stamped, and issued by the prisoner, as upon a state of facts which did not exist, with intent to defraud his employer, the United States. This, in my judgment, was a false making within the statute, and such a false making as constitutes the crime of forgery at common law. The writing is false, because it purports to be what it is not. It purports to be a money order of the United States, issued by its authority, after the receipt by its agent of the sum named therein, on the application of a real person, while, in truth and in fact, it was issued without such authority and contrary to law; it was issued without the prepayment of the sum named, on the pretended application of a fictitious person. Admitting the genuineness of these instruments, and nothing appears to the contrary, they had the legal efficacy sufficient to make them a possible or even an efficient means of fraud. 2 Bish. Crim.

Law, 533. Indeed, they were calculated, and exactly calculated, to defraud the United States, by enabling the holder wrongfully to obtain from its agents, at the several offices on which they were drawn, the several sums named therein.

However, it is contended that a person cannot commit forgery by making a false writing in his own name. But it must be borne in mind that forgery is not necessarily confined to the false writing of another's name. It may be, from the nature of things, that it is more often than otherwise committed in that way; but both reason and authority say that it may be committed in other ways. In 3 Bac. Abr. 745, tit. "Forgery," A, it is said:

"The notion of forgery doth not so much consist in the counterfeiting of a man's hand and seal, * * * but in endeavoring to give an appearance of truth to a mere deceit and falsity; and either to impose that upon the world as the solemn act of another which he is in no way privy to, or at least to make a man's own act appear to have been done at a time when it was not done, and by force of such falsity to give it an operation which in truth and justice it ought not to have."

And if the deceit consists in making it appear that a man's own act was done under circumstances which would make it valid and genuine, when in fact it was false and unauthorized, the result is the same. In the report for 1840 of the English Commissioners of the Criminal Law, cited by Mr. Bishop, (2 Crim. Law, § 584,) it is said:

"An offender may be guilty of a false making of an instrument, although he sign and execute it in his own name, in case it be false in any material part, and calculated to induce another to give credit to it as genuine and authentic, when it is false and deceptive."

And in *Regina* v. *Ritson*, L. R. 1 Cr. Cas. 200, (1859,) the very point so suggested was decided accordingly. A person, being the owner of certain land, sold and conveyed the same to another, who went into possession. Thereafter the vendor conveyed the greater portion of the premises to his son, by an indenture which they both executed, and falsely antedated so as to make it appear to have been executed before the real sale took place. Thereupon the son brought suit to eject his father's vendee, who in return caused the parties to the indenture to be indicted for forgery, of which they were duly convicted. The judges were of the unanimous opinion that the act was forgery. Mr. Justice KELLY, C. B., said "that every instrument which fraudulently purports to be that which it is not is a forgery, whether the falsehood of the instrument consists in the fact that it is made in a false name, or that the pretended date, when that is a material portion of the deed, is not the date at which the deed was in fact executed." And Mr. Bishop, (2 Crim. Law, 585,) after a careful examination of the subject, on authority and principle, concludes: "Plainly, the broad doctrine is not maintainable that it is incompetent for a man to commit forgery of an instrument executed by himself."

It may be admitted that this case is not in all particulars like any of these; that it is what may be called a new case. But in my judg-

ment there is no difference in law or morals in making a deed with a false date for the purpose of defrauding another, and falsely making and issuing a money order, as postmaster, without consideration or authority for the same purpose. In either case the party does, by force of his falsity and deceit, give the instrument, in the language of the authority above cited, "an operation which in truth and justice it ought not to have."

This case also comes within the well-known rule, long since established, that it is forgery for an agent, who has authority to fill, with a particular sum, a blank in a paper signed by his principal, to fill it with a larger one; or to fill it at all without authority. 1 Whart. Crim. Law, §§ 671, 672.

In my judgment, the filling the blank in each of these orders with the sum of $100 by the prisoner, when acting as the agent of the United States, contrary to his authority and the positive directions of his principal, being done with intent to defraud, was a false making and forgery thereof.

It is not necessary to consider whether the prisoner committed forgery in writing the name of J. G. Wilson on the backs of the three drafts on the bank at Omaha. Forgery may be committed by thus writing the name of a fictitious person on an instrument. If the existence of such a person is a question of fact and not law, and the instrument appears to be valid on its face, the offense is complete, provided the act was done with intent to defraud. 2 Bish. Crim. Law, 543. The fraud on the United States was accomplished when the money orders were paid to the bank for J. G. Wilson, *alias* Isaac N. Hibbs, and it is not apparent how he can be said to have intended to defraud any one when he put this *alias* on the back of these drafts for the purpose of receiving the amount due thereon. And, although the money with which they were purchased may have been stolen from the United States, still the bank was not injured or defrauded by paying them to Hibbs as indorsee of Wilson, and the fraud on the United States was already perpetrated.

In conclusion, my judgment is that the district court for the county of Nez Perces, Idaho, has jurisdiction of the prisoner, and of the crime of forgery for which he was extradited, and wherewith he is charged in the indictments pending thereon, and therefore this writ of *habeas corpus* must be dismissed, and the prisoner remanded to the custody of the marshal of Idaho.

In the consideration of this case, I own, I have not been unmindful of the fact that while the law ought not to be forced or stretched to meet this or any other emergency, it would be a reproach to the law of this country if the prisoner could not be punished for his misconduct while acting as postmaster at Lewiston. It does not appear that his offense is embezzlement. That crime only occurs when an agent or servant converts to his own use property intrusted to his care and possession by his principal or employer. Rapalje & L. Law

Dict. "Embezzlement;" 1 Whart. Crim. Law, § 1009. But the United States never intrusted Hibbs with the money he obtained from these several postmasters on these false orders, or in any way gave him the possession thereof. On the contrary, he obtained such possession fraudulently, by means of these false writings; and therefore it seems that, if his conduct does not constitute forgery, it is not embraced in the category of crimes defined and punishable by law.

I also think it proper to call attention to the fact that the application for this writ was not made and verified by the prisoner, as required by section 754 of the Revised Statutes. The Oregon Code allows the writ to issue on the petition of the person detained, or that of any one on his behalf. Doubtless, counsel who prepared the application did so under the apprehension that the proceeding was governed in this particular by the Code, and it was inadvertently allowed under probably the same apprehension.

The prisoner must be remanded to the custody of the marshal of Idaho, from whence he was taken; and it is so ordered.