**UNITED STATES of America, Appellant,**

v.

**BANK OF AMERICA NATIONAL TRUST AND SAVINGS ASSOCIATION, Appellee.**

**UNITED STATES of America, Appellant,**

v.

**SECURITY-FIRST NATIONAL BANK, Appellee.**

**Nos. 16164, 16165.**

United States Court of Appeals
Ninth Circuit.

Dec. 28, 1959.

See also 265 F.2d 862.

George C. Doub, Asst. Atty. Gen., Samuel D. Slade, Peter H. Schiff, Attorneys, Department of Justice, Washington, D. C., Laughlin E. Waters, U. S. Atty., Richard A. Lavine, Burton C. Jacobson, Asst. U. S. Attys., Los Angeles, Cal., for appellant.

Hugo A. Steinmeyer, George L. Beckwith, Los Angeles, Cal., Samuel B. Stewart, San Francisco, Cal., for appellee Bank of America Nat. Trust & Savings Ass'n.

Farrand, Fisher & Farrand, Ross C. Fisher, Knox Farrand and Stephen Farrand, Los Angeles, Cal., for appellee Security-First Nat. Bank.

Before STEPHENS, CHAMBERS and BARNES, Circuit Judges.

CHAMBERS, Circuit Judge.

In a certain sense, all forgers are impostors and, similarly, impostors in connection with commercial paper in a broad sense are usually forgers. But in the law merchant they are supposed to be separate people. Thus, if the payee is an impostor, a drawer-drawee (probably more properly considered as a maker) who pays a holder has no recourse on an endorser. If, however, he who signs the name of a payee may be classified as a forger, the drawer-drawee, after paying a subsequent endorser, may still recover his unfortunate payment from the endorser.[1]

Of course, it is settled that Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, does not apply to government commercial paper—it is purely federal business.[2] But this is not to say that the federal law turns its back on the law merchant.

And we yet find no evidence in the cases that the Supreme Court has rejected the rule of impostors on government checks as it is generally applied in most states on private checks. The lower federal courts have usually held the impostor rule applicable on government checks.[3] As in the decisions on forgers vis-a-vis impostors in private commercial papers, there may be some inconsistencies between the lower federal courts as to who classifies as a forger and who as an impostor.

The facts of these two cases are very similar to Atlantic National Bank of Jacksonville v. United States, 5 Cir., 250 F.2d 114. Obviously following that case, the district court here rendered judgment for the defendant banks, denying recovery by the United States of its lost money. The government, on appeal, as it did in the trial court, contends that Atlantic National is contrary to National Metropolitan Bank v. United States, 323 U.S. 454, 65 S.Ct. 354, 89 L.Ed. 383. The latter case, it says, dictates that we reverse the trial court. If this last premise is correct, naturally a reversal is required. However, we deem National Metropolitan a true forger case and Atlantic National and our two cases true impostor situations. And we fail to find in National Metropolitan the overtones which would require us to apply it on the facts of these cases.

Here the government's Internal Revenue Service was swindled, no doubt about it. The scheme involved refund checks fraudulently obtained for pretended overpayments of federal income tax. The

1. Security-First National Bank of Los Angeles v. United States, 9 Cir., 103 F.2d 188, a case based on the California imposter rule.

2. Clearfield Trust Co. v. United States, 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838.

3. United States v. Continental-American Bank & Trust Co., 5 Cir., 175 F.2d 271, certiorari denied 338 U.S. 870, 70 S.Ct. 146, 94 L.Ed. 534; United States v. First National Bank of Albuquerque, 10 Cir., 131 F.2d 985.

facts were all stipulated. The only difference in the Security Bank and the Bank of America cases is that the swindlers, after the loss, were identified in the Security case and never identified in the Bank of America cases. Indeed, the true names of the swindlers appear as endorsers on some of the checks involving Security. But no one has suggested the variations in any of the endorsements require different legal results on different checks.

On the Security group of 58 checks involving amounts from $101.40 to $290.47 for a total of $9,715.15, the facts were these. Aline Lange Lee was a real estate broker in Los Angeles. She and members of her family prepared fictitious income tax withholding (W–2) forms. These purported to be the employees' copies received from employers. The forms listed fictitious employees, and if the employers listed on the forms existed, they had no connection with the forms. Then "phony" income tax returns were prepared for the fictitious employees and submitted along with the corresponding W–2 forms. These were all sent to the district director of Internal Revenue at Los Angeles. Without any checking for verity, in due time one or another disbursing officer of the Treasury Department issued treasury checks for the amounts requested on the income tax returns and mailed the checks to the addressees and addresses shown on the returns. Members of the Lee family (who were waiting for the checks) endorsed thereon the identical signatures appearing on the returns showing (and requesting) a refund. Usually some subsequent endorsement also appeared thereon. The bank, after endorsing "all prior endorsements guaranteed," collected each check through the Federal Reserve Bank at Los Angeles.

When the fraud was discovered, the government demanded of the bank re-

payment in full with interest. The demand being rejected, an action in the district court followed.

Inasmuch as no reason for a different result in Bank of America has been suggested or suggests itself, we do not recite the special facts thereof other than the one mentioned that the swindler or swindlers have not been identified. The crucial facts were the same. (The Bank of America case involved seven checks for a total of $1,341.08.)

■ It would appear that the impostor rule in the law merchant first began in face to face dealings and later was extended to swindles in the mail having the same essential characteristics.[4] Inherent in the impostor rule is the concept that as between the impostor and the rest of the world, the impostor payee acquires title[5] to the piece of commercial paper issued by the drawer; therefore, the drawer-maker's only recourse is against the impostor, subsequent unconditional endorsements (without notice) notwithstanding.

■ Of course, what makes the difference between the impostor in law and the forger in law is the intent of the maker, something not to be found on the face or back of the instrument.[6] And it may be argued that something so amorphous as a great and complicated government cannot have intent. But we think it has not been adjudicated that its agents cannot and do not have intent. We think we find it here. We think those in the government chain responsible for issuing the check, while they had no man or woman in the flesh standing before them or even a mental picture of his or her dimensions, did have an intent to issue the check to the person who wrote the name on the spurious return and who eventually endorsed the check. What they would have thought had they known the facts, to us is immaterial. We believe the government cannot cancel

4. See discussion, Britton on Bills and Notes, § 151, page 715.

5. Voidable title, of course, as between

the drawer and the impostor, and voidable against one with notice.

6. See Cohen v. Lincoln Savings Bank of Brooklyn, 275 N.Y. 399, 10 N.E.2d 457.

every check and get recourse on every endorser because of fraud in the inception. If Aline Lee, identifying herself as Aline Lee, had sent in an income tax return and attached it to a spurious W-2 form showing the payment of wages never paid by an existent or non-existent employer and upon the basis thereof had obtained a refund on a government check, we assume that short shrift would be made of any suit against the successive endorsers. A court would hold the issue was only between the government and the payee.

Also, we state this case. Suppose Aline Lee had in her business dealings regularly assumed another name. If she filed her returns under that name (and if it was unknown to the director that her true name was different), we do not perceive how a refund check issued to her could later cause legitimate grief to successive endorsers. Indeed, as we see it, the impostors who signed the return existed and were the persons who first endorsed the checks, even though they did not usually operate under such names. The essence of legal forgery is that the maker-drawer intended to obligate himself to a definite living person called A. The title of the instrument belongs to A or the drawer. Instead B gets the check and writes A's name thereon. In such cases, whose who endorse do so at their peril, guaranteeing in law that the payee was he whom the maker-drawer intended to pay. But, "no title in the forger" is the foundation of the rule.

As above indicated, we think we have here true impostor cases. If the law for federal commercial paper is to be fashioned differently than the usual law merchant, it will have to be on a basis of a judicial rule that a government agent acting for his government cannot pass title to the paper he issues in line with his accustomed authority, if in the transaction the government has been defrauded, even when the government agent, as here, is wholly innocent of the fraud and deals with an impostor. That the Supreme Court will so rule we have been unable to find a harbinger

thereof in its cases. Such an idea, perhaps less broadly stated, we think may underlie the dissent in the Atlantic National case, supra.

Although we still remain unpersuaded, it should be noted that counsel for the government have here presented a brief reflecting both industry and excellence.

The judgments in the two cases are severally affirmed.