**UNITED STATES of America**

v.

**Amy Everston JONES.**

**Crim. No. W–75–0854.**

United States District Court, D. Maryland.

May 13, 1976.

Jervis S. Finney, U. S. Atty., Robert A. Rohrbaugh, Asst. U. S. Atty., Baltimore, Md., for plaintiff.

Gerald A. Kroop, Baltimore, Md., for defendant.

MEMORANDUM OPINION AND ORDER

WATKINS, District Judge.

Defendant Amy Everston Jones is charged in a ten-count indictment with

transportation in interstate commerce of stolen, converted, or fraudulently obtained securities valued at more than $5,000 in violation of 18 U.S.C. § 2314; and with receiving, selling, or disposing of those same securities knowing them to have been stolen, converted, or taken by fraud, in violation of 18 U.S.C. § 2315.

The securities at issue are five checks,[1] payable to the order of "A. L. E. Jones," [2] drawn on the Royal Bank of Canada against the account of Inglis, Limited, a Canadian appliance firm. The government alleges that Defendant transported these checks from Canada to Maryland (or that they were sent to her) and that the checks were then deposited in a Maryland bank account.

For purposes of this motion, it is not disputed that these checks were "stolen, converted or taken by fraud." Defendant contends, however, that the Inglis securities are not genuine and are instead forgeries of checks of a foreign corporation, to which §§ 2314 and 2315 expressly do not apply. Defendant has, therefore, moved that the instant indictment be dismissed.[3]

Except for minor differences in punctuation, the exclusionary language referring to foreign securities is the same in the two sections. Section 2314 provides, in pertinent part, as follows:

This section shall not apply to any falsely made, forged, altered, counterfeited or spurious representation of an obligation or other security of the United States, or of an obligation, bond, certificate, security, treasury note, bill, promise to pay or bank note issued by any foreign government or by a bank or corporation of any foreign country.

Under most circumstances, the issue of genuineness of instruments poses little difficulty; certainly there is no dearth of authority as to what constitutes a forgery at common law and for purposes of the various federal forgery statutes. The circumstances of the instant case, however, are not the usual ones. The Inglis checks were printed by a computer, complete with authorized facsimile signatures, and, it is alleged, were the direct result of tampering by an Inglis employee with data records stored in the computer and with payment data inserted into the computer. Whether or not they can be characterized as "falsely made, forged, altered, counterfeited or spurious" poses an interesting question and one which the Court considers novel in the case law.

The unusual nature of this case requires that the facts be recited in some detail.

Inglis, Limited, is a Canadian company which routinely purchases substantial quantities of household appliances from Whirlpool Corporation, a United States manufacturer. The accounts payable generated by these purchases are processed through a rather complex system at Inglis which in part involves manual accounting techniques but which culminates in the issuance of checks by means of automated electronic data processing equipment.

According to Edward McCormack, comptroller and assistant treasurer of Inglis, the system is initiated by the arrival of invoices and other documents (including warehouse receipts, customs clearing documents, and shipping manifests) associated with a particular purchase or shipment. These materials are collected and matched with records of orders. The information needed to proc-

---

1. Checks are included in the definition of "securities" for purposes of §§ 2314 and 2315; *see,* 18 U.S.C. § 2311.

2. "A. L. E. Jones" appears to be the true name of the Defendant.

3. At the time the instant motion was filed it appeared to be Defendant's contention that the exclusionary language would have applied even to bar a prosecution arising from a transaction involving genuine foreign securities. Such an

assertion is flatly refuted by the plain language of the statute and also by the evident purpose of the legislation, which was to avoid duplication with other statutory provisions dealing specifically with foreign forgeries. *See,* generally, *United States v. Galardi,* 476 F.2d 1072, 1077–1078 (9 Cir. 1973), *reh. denied, cert. denied,* 414 U.S. 839, 856, 94 S.Ct. 90, 160, 38 L.Ed.2d 75, 106. At the hearing, however, Defendant argued that the securities at issue were forged.

ess payment of the account is then extracted from the various documents and written down on an "accounts payable distribution slip." This information includes the invoice number, the date, the amount due, and a vendor code number. The vendor code number is used to identify the payee to the computer, which issues the actual check.

The data thus collected are verified within the accounts payable department, and batches of documents, with verified accounts payable distribution slips attached, are then sent to the keypunch operators. The keypunch operators do not check any of the information given them; they merely take the information necessary to process the payment from the accounts payable distribution slip and prepare it for entry into the computer by transferring it to a computer keypunch card. The data thus processed are entered into the computer and are retained in the computer memory as "open item entries." Periodically, the computer is commanded to execute a "check run" by printing checks for all entries on the "open item" list. The checks are automatically printed by the computer in fully negotiable form, complete with facsimile signatures.

According to the theory advanced by the government, and not disputed by the Defendant for purposes of this motion alone, the checks in question resulted when an alleged confederate of the Defendant, one Michael Everston, tampered with certain of the data being processed through the system described above. At the time of the alleged tampering, Everston was supervisor of the accounts payable department. As such, he was familiar with all aspects of the system, including the verification techniques employed to assure the proper payment of accounts payable.

The first step in the scheme alleged by the government was the creation of an improper vendor code listing in the computer which would have rendered the computer receptive to the insertion of false data at a later time. An exhibit filed at the hearing suggests that this was done by means of an order to change vendor codes and addresses issued on September 3, 1975, allegedly at the direction of Michael Everston. That order contained an instruction to create a new vendor code, 99894, to correspond to "A.L.E. Jones, P. O. Box 123." Creation of this code within the computer's memory ensured that any order to pay code 99894, if properly entered into the computer, would automatically result in the issuance of a check payable to the order of "A.L.E. Jones."

The second step in the scheme involved the entry into the computer of data relating to specific checks to be issued to A.L.E. Jones. According to the government, Everston's supervisory position enabled him to obtain batches of Whirlpool invoices with attached accounts payable distribution slips after the documents had been verified as described above. Then, the government alleges, Everston prepared accounts payable distribution slips like those which had been prepared in his department but bearing the vendor code "99894" instead of the proper vendor code corresponding to Whirlpool.

As the final element in the scheme, the documents and accounts payable distribution slips were allegedly forwarded to keypunch. The data on the accounts payable distribution slips were routinely transferred to keypunch cards. When directed, the computer read the data from the keypunch cards and stored the information in its memory. In due course, when commanded to process a check run, the computer automatically printed checks payable to the order of "A.L.E. Jones" which had been intended to be made payable to the order of Whirlpool Corporation. The government then alleges that the "A.L.E. Jones" checks were sent or given to the Defendant, who, it is charged, deposited them in a bank account in Maryland.

Assuming all of this to be true for purposes of the instant motion only, the question is whether or not checks thus produced can properly be the subject matter of a prosecution under §§ 2314 and 2315.

■ It has long been settled in this circuit that the terms "falsely made, forged, altered, or counterfeited" as used in § 2314 are substantially synonymous and refer to

the crime of forgery. *Greathouse v. United States*, 170 F.2d 512, 514 (4 Cir. 1948). Since § 2315 was enacted at the same time and as part of the same law, the National Stolen Property Act, it seems clear that a single construction would apply to essentially identical language in the two sections. Furthermore, it would seem that the term "spurious" must likewise be considered *ejusdem generis*, since a contrary construction would require the Court either to hold that the exclusionary provision excises from the statutes that which was not included, or to regard the term "spurious" as surplusage.

A forged writing was defined in *Greathouse* as one "which falsely purports to be the writing of another person than the actual maker." *Greathouse, supra,* at 514. It seems apparent from the sources relied upon that this was intended to express the meaning of forgery as it is known at common law. Furthermore, the Supreme Court defined what it termed "the concept of 'federal' forgery" as being no broader than its common law counterpart, in the absence of some contrary indication in the statute or legislative history. *Gilbert v. United States*, 370 U.S. 650, 655, 82 S.Ct. 1399, 1402, 8 L.Ed.2d 750, 754 (1962). Although the Court was there referring specifically to 18 U.S.C. § 495, the construction of § 2314 in *Greathouse* was noted with approval; *Gilbert, supra,* at 657, 82 S.Ct. at 1403, 8 L.Ed.2d at 755. The area of consideration in this case is thus circumscribed by what would have been a forgery at common law.

■ In contending the Inglis checks were forgeries, the Defendant has relied principally on those cases which have held that one who obtains a stolen instrument in blank and later completes it, has committed a forgery. *See, e. g., United States v. Galardi*, 476 F.2d 1072 (9 Cir. 1973), *cert. denied* 414 U.S. 839, 856, 94 S.Ct. 90, 160, 38 L.Ed.2d 75, 106; *United States v. Brown*, 417 F.2d 1068 (5 Cir. 1969); *United States v. Franco*, 413 F.2d 282 (5 Cir. 1969), and *Ketchum v. United States*, 327 F.Supp. 768 (D.Md.1971). Such a scheme would ordinarily constitute forgery, even though the blank is filled with the name of a real person and even if the thief-forger uses his or her own name. *Ketchum, supra,* at 770; *but see, United States v. Brown*, 344 F.Supp. 291, 294 (E.D.Va.1972).

The government urges two alternative theories. First, it is contended, even conceding that the substitution of "A.L.E. Jones" for Whirlpool constituted a false writing, the falsity was in the meaning rather than in the making of the instrument. Thus, the government seeks to bring the instant case within the rule stated by Wharton and quoted by the government in its brief that:

> . . . when a person writes a letter or fills out a loan application which he signs with his own name intending that it be accepted as his writing, he is not guilty of forgery because statements contained therein are false and their falsity was known to him. The better view, and that supported by the majority opinion, is that under the common law under statutes defining forgery is [sic] substantially the language of the common law definitions, the genuine making of an instrument for the purpose of defrauding does not constitute the crime of forgery. In other words, the term 'falsely' as applied to making or altering a writing in order to make it a forgery, does not refer to the contents or the tenor of the writing or to the facts stated therein, but implies that the paper or writing is not genuine, that in itself it is false or counterfeit.

2 Wharton's Criminal Law, Section 634, pp. 412–413 (1957). In essence the government argues that the documents in question are genuine, but contain false statements. Furthermore, the government argues, such "genuine" documents would not have been regarded as forgeries at common law even though their execution might have been procured by fraud, citing the following language:

> According to settled authority, it is not forgery to obtain a person's signature to an instrument by means of false and fraudulent representations as to its contents, or as to the purpose for which the

instrument is to be used.[4] Nor is it forgery to fraudulently procure a person's signature to an instrument which has previously been altered without his knowledge.

Clark and Marshall, *A Treatise on the Law of Crimes,* Section 12.34, p. 961 (1967) (footnotes and citations omitted in the government's brief).

Neither the doctrine advanced by the Defendant nor those put forward by the government are apposite to the case at bar.

The cases cited by the Defendant all involve the fraudulent making or alteration of an instrument by one who is a stranger to the instrument. In the instant case, however, the individual who drafted the instrument in a practical sense was Everston, although he employed the computer as the instrumentality by which the checks were physically drawn. Everston, unlike the defendants held to have committed forgery in *Ketchum* and like cases, was authorized for certain purposes to direct the entry of data into the computer and thus initiate the drafting of checks bearing authorized Inglis signatures; although, if the government's theory is correct, Everston was in no way authorized to effect the creation of the particular checks at issue.

▮ Nor do the theories urged by the government provide an answer. The government's contention that the instruments, if genuine, cannot be considered forged merely because they contain false information is correct: *see, Marteney v. United States,* 216 F.2d 760, 763 (10 Cir. 1954). Where the falsity in an instrument is in its content, rather than in the manner of making, the instrument is not a forgery. *Gilbert, supra,* 370 U.S. at 658, 82 S.Ct. at 1404, 8 L.Ed.2d at 756. This expression,

however, merely restates the venerable rule that a lie will not be considered forgery at common law merely because it is written down; it retains its character as fraud or misrepresentation. For example, it is settled that there is no common law forgery where an agent, in executing a document purportedly authorized by his principal, misrepresents the extent of his authority on the face of the instrument. *Gilbert, supra. See, also, Cunningham v. United States,* 272 F.2d 791, 793–794 (4 Cir. 1959), and *Selvidge v. United States,* 290 F.2d 894, 895 (10 Cir. 1961). The application of this doctrine, however, presupposes a statement *on the face of the instrument* which is false as to its meaning, and there is no such statement with respect to the Inglis checks.[5] The only words on the checks that can in any way be characterized as false are "A.L.E. Jones," and those words make no assertion, either true or false; their only falsity lies in the fact that their presence on the instruments was unauthorized.

But even assuming that the mere presence of the payee's name on the instrument can in these circumstances be considered an "assertion" capable of characterization as true or false, a premise this Court does not accept, the rule as to falsity of content has no application where the documents were in fact falsely made.

With respect to false making, the government's principal authority is the quotation from Clark and Marshall noted above. That language cannot be applied to the facts of the instant case.

As is apparent from the case authority cited in their treatise, Clark and Marshall were referring to situations involving two parties and the reliance by one on fraudulent misrepresentations of another.[6] As

---

**4.** In fact, the matter is not settled among the American decisions, although the better and perhaps the majority view seems to be in accord with Clark and Marshall. *See, Wharton, supra,* § 635 at 415.

**5.** Quite conceivably the accounts payable distribution slips were false as to meaning, rather than making, and could not themselves be considered forgeries. However, the Court is concerned in the instant case only with the checks.

In any event, forgeries or not, the slips could not properly be the basis of a charge under §§ 2314 and 2315 since there is no nexus with interstate commerce as to them.

**6.** It is clear that the two-party situation was the subject matter of the quote from Clark and Marshall. Citation was made therein to *Regina v. Chadwick* (1844), 2 Moody & Robinson 545; there, the question was whether or not the Defendant had induced creditors of his princi-

with the lie set to writing which does not thereby become forgery, that which is essentially false pretenses or misrepresentation retains its character as such.

In the case at bar, however, there were no fraudulent misrepresentations to any second party and in fact there was no second party to be deceived.

■ As the government urged at the hearing, the mere fact that a computer was used to print these checks should not be permitted to confuse the matter. The computer was merely an inanimate and obedient instrumentality employed by Everston, who himself accomplished everything necessary to assure the issuance of checks to an unauthorized payee and was, as a practical matter, the drawer of the checks. Like a checkwriting machine or a ball point pen, the computer did exactly what it was told to do by its program and by the data inserted at Everston's command. Likewise, the keypunch operator's function was to follow instructions exactly and to punch into computer cards exactly the information given. It was only by means of this mechanical process that the computer could digest the information; and it is fair to say that the operator, acting routinely, functioned in a sense as an adjunct of the machine. At most, the computer operator was the innocent agent of Everston.

These facts, therefore, describe a one-party transaction without any of the deception described by Clark and Marshall. That deception was rendered unnecessary by the seemingly efficient system devised at Inglis which made it possible for one man to accomplish the entire transaction in essence singlehandedly.

■ That being the case, it seems plain that the checks fit within the definition of forgery. It has long been the rule that an agent may commit forgery by executing an instrument in disobedience of his instructions, provided that the requisite *mens rea* exists and that the documents so executed have the capacity to defraud. *Selvidge, supra,* at 895.[7]

*Selvidge* itself involved a false agency endorsement, as noted above. Such endorsements are now held not to be forgery. The Court noted, however, that the critical factor was the assertion on the face of the instrument that the Defendant was acting as an agent and stated that "if Selvidge had merely endorsed the name of her principal and cashed the checks contrary to her instructions, the crime of forgery would have been complete." *Selvidge, supra,* at 895.

■ This "rule of general application" is in harmony with the established concept that it is "the giving [to an instrument of] a false appearance of having been executed by [the principal] which makes a man guilty of forgery." 1 Hawkins, *Pleas of the Crown,* Ch. 21 § 5 at 256 (1824). In making his own unauthorized act appear to be the act of his principal, the agent commits forgery in the classical sense; he makes a "writing which falsely purports to be the writing of another." *Greathouse, supra,* at 514.

The rule has been most often expressed in the English cases. Typical is the case of *Regina v. Wilson* (1848), 2 Car. & K. 527, 175 Eng.Rep. 219 (Nisi Prius Book 6) in which a clerk was given a check that had been signed but was otherwise blank, with

---

pal to sign a receipt which he had fraudulently altered as to amount. In ruling that this would not have been a forgery, provided the alteration preceded the signature, Baron Rolfe referred to an earlier case in which he had considered the doctrine generally, that being *Regina v. Collins* (1843), 2 Moody & Robinson 461. In that case, Baron Rolfe stated that it would not be forgery fraudulently to induce a person to execute an instrument based on a misrepresentation as to its contents because, if such a charge were permissible, "any party might be indicted for forgery who prevails on a man to execute a

deed by misrepresenting its legal effect." *Regina v. Collins, supra,* at 466.

7. The rule can be traced at least as far as the Statute 5 Elizabeth Ch. 14 (1562–1563), which provided that the insertion of a clause into a will purporting a devise of lands without warrant or direction of the devisor is forgery even though the insertion is made in the lifetime of the testator and by the clerk authorized to draft the will. 1 Hale, *Pleas of the Crown,* Ch. 64 p. 684 (1847).

instructions to fill in the check to a certain amount and then to give the proceeds to one Williamson. The clerk instead filled the check out to a larger amount, cashed the check, and converted the proceeds. This was held to be forgery, fourteen judges concurring.

The rule has been stated less often, but with no less authority, in the American cases. It was recognized early in *Ex Parte Hibbs,* 26 F. 421 (D.Or.1886). A postal employee, authorized to issue money orders when paid for, made out money orders for which no payment had been received and converted the proceeds. This was held to be forgery:

> The instruments set out in these indictments, and of which the prisoner is thereby charged with forging, purport to be postal money orders of the United States. They were issued without authority, and contrary to the prohibition of law. They were falsely made, filled up, signed, stamped, and issued by the prisoner, as upon a state of facts which did not exist, with intent to defraud his employer, the United States. This, in my judgment, was a false making within the statute, and such a false making as constitutes the crime of forgery at common law. The writing is false, because it purports to be what it is not. It purports to be a money order of the United States, issued by its authority, after the receipt by its agent of the sum named therein, on the application of a real person, while in truth and in fact, it was issued without such authority and contrary to law · ·

*Hibbs, supra,* at 432.

*See, also, Quick Service Box Co. v. St. Paul Mercury Ind. Co.,* 95 F.2d 15, 17 (7 Cir. 1938) (bookkeeper obtained signatures of his employer to blank checks and, *in excess* of authority, filled in the blanks and appropriated the proceeds; held, forgery).[8]

This situation must be distinguished, of course, from the cases that deal with agency endorsements such as *Gilbert* and *Selvidge.* The reason for the rule that false agency endorsements are not forgery is that the party who would be defrauded by such a false endorsement would not regard the endorsement as the act of the principal; instead, his reliance would be upon the existence of authority as evidenced by the representation of agency on the instrument. The distinction between the case where the agency is stated on the document and those, such as the case at bar, where there is no such representation and where the party to whom the instrument is given regards it as the act of the principal, is very clear. It is a "decisive circumstance which compels a different conclusion," *Selvidge, supra,* at 896. That distinction was drawn in *Selvidge* with respect to *Hibbs* and *Quick Service Box,,* and was explicitly approved by the Supreme Court in *Gilbert, supra,* 370 U.S. at 658 n. 12, 82 S.Ct. at 1403, 8 L.Ed.2d at 756.

Additionally, the case at bar should be distinguished from those that involved an agent with general authority. A case nearly identical with the instant case, except for that critical factual difference, is *Regina v. Richardson,* (1860), 2 F. & F. 343, 175 Eng. Rep. 1088 (Nisi Prius Book 6). In that case, the Defendant had been employed as a clerk with authority to pay the routine expenses of the business. To that end, he was given control of the cash on hand, into which he was to pay receipts. When necessary, he was authorized generally to cash checks on that account, drawing the money himself and then using it to pay the credi-

---

8. The District of Columbia Circuit had likewise declared the rule in *Yeager v. United States,* 59 App.D.C. 11, 32 F.2d 402 (1929). There an employee authorized to endorse checks and deposit them to his employer's account instead endorsed the checks and pocketed the proceeds. This was held to be forgery under the rule cited in *Hibbs.* 32 F.2d at 402. It may be, as later developed, and as noted in *Selvidge,* that *Yeager* was wrongly decided because the endorsement was an agency endorsement, a fact that did not come to light in the case law until some three years after *Yeager* had been decided. *See,* 290 F.2d at 896. However, *Yeager* is still authority, although perhaps no more than dictum, in support of the rule of forgery by an authorized agent.

tors. On one occasion he cashed such a check and entered into the books a notation that he had used the proceeds to pay a creditor when, in fact, he had converted the funds. This was held not to be forgery, because the Defendant's authority was limited only by the amount in the account; rather than draw checks to the creditors, his function was to cash checks and pay over the cash. In cashing the check at issue, he quite possibly had not exceeded his authority; his crime was misappropriation of the proceeds *after* the check had been cashed, rather than forgery. 175 Eng.Rep. at 1089. ·

Everston, however, had no such general authority to draw checks. His authority was strictly limited by the parameters of the accounts receivable, which were to be satisfied by check rather than out of any cash fund over which Everston had control. Unlike the clerk in *Richardson*, he clearly acted outside the scope of his authority. By executing documents without authority in such a way that they appeared to be the solemn act of his principal, Everston committed forgery, given, of course, that the government's allegations are true.[9]

Since, under the theory of this transaction advanced by the government, the checks were "forged . . . securit[ies] . . . issued by . . . a bank or corporation of any foreign country," prosecution under §§ 2314 and 2315 is improper, and the indictment must be dismissed.

Accordingly, it is this 13th day of May, 1975, by the United States District Court for the District of Maryland, ORDERED:

(1) That the motion of the Defendant to dismiss the indictment BE, and the same hereby IS, GRANTED;

(2) That the indictment in the instant case BE, and the same hereby IS, DISMISSED; and

(3) The Clerk of the Court is directed to send copies of the foregoing Memorandum Opinion and Order to Gerald A. Kroop, Esquire, and to Jervis S. Finney, United States Attorney for the District of Maryland.

---

**9.** In holding these checks to be forgeries, the Court expresses no opinion as to any possible questions of civil liability. Those questions involve considerations which are irrelevant in the context of a criminal prosecution, such as any possible fault, estoppel, or application of the impostor rule. *United States v. Union Trust Co.*, 139 F.Supp. 819, 820 (D.Md.1956).