UNITED STATES of America, Appellant,

v.

**Amy Everston JONES, Appellee.**

**No. 76–1815.**

United States Court of Appeals,
Fourth Circuit.

Argued Dec. 10, 1976.

Decided April 12, 1977.

Certiorari Denied June 13, 1977.
See 97 S.Ct. 2928.

---

Robert A. Rohrbaugh, Asst. U. S. Atty., Baltimore, Md. (Jervis S. Finney, U. S. Atty., Baltimore, Md., on brief), for appellant.

No argument for the appellee.

Before WINTER and CRAVEN, Circuit Judges, and FIELD, Senior Circuit Judge.

FIELD, Senior Circuit Judge:

A ten-count indictment was returned against Amy Everston Jones, charging her with five counts of transporting in interstate or foreign commerce securities [1] valued at more than $5,000.00, knowing the same to have been "stolen, converted or taken by fraud" in violation of 18 U.S.C. § 2314; and five counts of selling or receiving these same securities knowing them to have been stolen, unlawfully converted or taken by fraud, in violation of 18 U.S.C. § 2315. The defendant moved to dismiss the indictment, contending that the securities involved in the case were forgeries and thus excluded by the limiting language of sections 2314 and 2315.[2] The district court agreed with the defendant and dismissed the indictment.[3] The Government has appealed.[4]

The facts, as presented by the Government, were not basically contested by the appellee and "[f]or [the] purposes of [the motion to dismiss], it [was] not disput-

1. The securities here were checks and fall within sections 2314 and 2315. *See* 18 U.S.C. § 2311.

2. The limiting language of section 2314, basically mirrored in section 2315, provides that:

"This section shall not apply to any falsely made, forged, altered, counterfeited or spurious representation of an obligation or other security of the United States, or of an obligation, bond, certificate, security, treasury note, bill, promise to pay or bank note issued by any foreign government or by a bank or corporation of any foreign country."

3. *United States v. Jones,* 414 F.Supp. 964 (D.Md.1976).

4. The Government's right to appeal is well established. *See* 18 U.S.C. § 3731. *See also Serfass v. United States,* 420 U.S. 377, 387, 95 S.Ct. 1055, 43 L.Ed.2d 265 (1975); *United States v. Mann,* 517 F.2d 259, 266 (5 Cir. 1975), *cert. denied,* 423 U.S. 1087, 96 S.Ct. 878, 47 L.Ed.2d 97 (1976).

ed that these checks were 'stolen, converted or taken by fraud'."[5] Accordingly, if the securities were not excluded by the limiting paragraphs of sections 2314 and 2315, the acts committed by Jones would constitute indictable offenses.

This is a case of computer abuse,[6] involving the input[7] into a computer facility of allegedly altered accounts payable data. The computer crime was perpetrated against a Canadian company, Inglis, Limited, which is a subsidiary of Whirlpool Corporation, a United States corporation. It specifically involved the issuance of five checks to one "A.L.E. Jones"[8] which should have been issued to Whirlpool. It is the Government's theory that the appellee transported or caused these checks to be transported from Canada to Maryland;[9] and then disposed of the checks when they arrived in Maryland.[10]

An understanding of Inglis' accounting system is necessary to explain the scheme devised by the appellee and her cohort, one Michael Everston, who was the supervisor of Inglis' accounts payable department. When payments are made to Inglis' vendors, the supporting documents (invoices and evidence of receipt of goods) are matched in the accounts payable department by the invoice audit clerks. These clerks then attach an accounts payable distribution slip to the supporting documents. At the accounts payable distribution slip level, the clerks record (1) the invoice number, (2) the vendor and/or supplier number, and (3) the amount of the invoice. The clerks then initial as to the recording of that data. The accounts payable distribution slip is attached to the documents to facilitate the preparation and the collection of the data on the supporting documents. The invoice audit clerks then forward the documents to another accounts payable clerk who logs and records the voucher or the accounts payable number. The documents are then transferred to the data processing area where receipt of the documents is noted and they are sent to a key punch

5. 414 F.Supp. at 965. Unfortunately, the appellee failed to respond to the Government's appeal of the indictment's dismissal. We therefore assume that the facts are stipulated for the purposes of this appeal and note that there does not exist a double jeopardy problem in the appeal of a case wherein the defendant stipulates facts solely for the purpose of attacking the validity of the indictment. *See United States v. Pecora*, 484 F.2d 1289, 1293 (3 Cir. 1973).

6. Criminal acts in the use of computers is rapidly increasing. *See* D. Parker, Crime by Computer (1976); R. Farr, The Electronic Criminals (1975); S. Liebholz and L. Wilson, User's Guide to Computer Crime 23 (1974); D. Parker, S. Nycum, & S. Oura, Computer Abuse (Stanford Research Inst. 1973); Allen, Embezzler's Guide to the Computer, 53 Harv.Business Rev. 79 (July 1975); 88 Newsweek 58 (Aug. 9, 1976).

7. "Input refers to data capture, e. g., keypunching, optical character recognition, and the entry of the data into the system in machine-readable form. The possible abuses included in this function are omission of documents, creation of entirely false records, and the altering of amounts, names, and the like, on otherwise authentic documents." Nycum, Computer Abuses Raise New Legal Problems, 61 A.B.A.J. 444, 446 (Apr. 1976).

8. "'A.L.E. Jones' appears to be the true name of the Defendant." 414 F.Supp. at 965, n. 2.

9. Count One of the indictment is an example of the alleged section 2314 violations:
    On or about September 12, 1975, in the State and District of Maryland,
    AMY EVERSTON JONES,
    did willfully and knowingly transport and cause to be transported in interstate and foreign commerce from Canada to the State of Maryland, securities and money which were stolen, converted and taken by fraud, to-wit, a check # 47456 in the amount of $11,138.04 payable to A.L.E. Jones, drawn on the account of Englis (sic) Limited, then knowing the same to have been stolen, converted and taken by fraud.

10. Count Six of the indictment is illustrative of the section 2315 violations:
    On or about the 12th day of September, 1975, in the State and District of Maryland,
    AMY EVERSTON JONES,
    did receive, conceal and dispose of certain securities and money that is, a check # 47456 in the amount of $11,138.04, payable to A.L.E. Jones, drawn on the account of Englis (sic) Limited, which were moving as, were part of, and constituted interstate and foreign commerce from Canada to the State of Maryland, knowing the same to have been stolen, unlawfully converted and taken.

operator who sets up cards for the documents. The papers are then picked up by a data control clerk who takes them to a production area for computer processing. Once fed into the computer, it then produces a report called a balancing report which is used to identify all of the invoices in a particular batch. The totals which appear on the balancing report are compared to a taped total which is attached to the group of documents, and this total is then compared against a log maintained by the data processing area. The documents are then sent back to the accounts payable department for a further verification of their accuracy. After the data is entered into the computer, an order is given to the computer to print-out checks, complete with facsimile signatures, payable to the order of the designated payee.

According to the government's testimony the appellee's accomplice, Everston, directed an accounts payable clerk to set up documents under the name of "A.L.E. Jones" which included a vendor number "98844". He then altered Whirlpool accounts payable documents by changing Whirlpool's vendor number "99900" to "98844" to correspond to the "A.L.E. Jones" account. Through a process of personally reviewing the groups of accounts payable documents, Everston was able to store these altered documents in the Inglis computer. Ultimately, the computer issued checks payable to the account of "A.L.E. Jones" which should have been paid to Whirlpool Corporation. The five checks thus issued resulted in over $130,000.00 being paid to the "A.L.E. Jones" account. Upon receipt of the checks in Maryland the appellee deposited them in a specified account to her credit.

The sole issue is whether the alteration of accounts payable documents fed into a computer which resulted in the issuance of checks payable to an improper payee constituted a "falsely made, forged, altered, counterfeited or spurious" security within the meaning of the exclusionary clauses of sections 2314 and 2315 of Title 18.

In considering the phrase "falsely made, forged, altered, or counterfeited" in the statutory sections the district court correctly noted that the terms "are substantially synonymous and refer to the crime of forgery. *Greathouse v. United States,* 170 F.2d 512, 514 (4 Cir. 1948)." [11] We also agree with the district court's conclusion that the term "forgery" should be viewed in the light of its common law meaning:

"A forged writing was defined in *Greathouse* as one 'which falsely purports to be the writing of another person than the actual maker.' *Greathouse, supra,* at 514. It seems apparent from the sources relied upon that this was intended to express the meaning of forgery as it is known at common law. Furthermore, the Supreme Court defined what it termed 'the concept of "federal" forgery' as being no broader than its common law counterpart, in the absence of some contrary indication in the statute or legislative history. *Gilbert v. United States,* 370 U.S. 650, 655, 82 S.Ct. 1399, 1402, 8 L.Ed.2d 750, 754 (1962). Although the Court was there referring specifically to 18 U.S.C. § 495, the construction of § 2314 in *Greathouse* was noted with approval; *Gilbert, supra,* at 657, 82 S.Ct. at 1403, 8 L.Ed.2d at 755. The area of consideration in this case is thus circumscribed by what would have been a forgery at common law." [12]

However, we disagree with the district court's conclusion that the acts committed by Everston constituted common law forgery. The Supreme Court has noted that " '[f]orgery, or the *crimen falsi,* * * may with us be defined (at common law) to be, "the fraudulent making or alteration of a writing to the prejudice of another man's right" * * *.' 4 Blackstone, Commentaries (Christian ed. 1809), 247–248." *Gilbert v. United States,* 370 U.S. 650, 657 n. 10, 82 S.Ct. 1399, 1403, 8 L.Ed.2d 750 (1962). Significantly then, "[a]n essential element of the crime of forgery is *making* the false

11. 414 F.Supp. at 966–67.

12. *Id.,* at 967.

writing \* \* \*." *United States v. Maybury,* 274 F.2d 899, 903 (2 Cir. 1960) (emphasis added). *See Carr v. United States,* 278 F.2d 702, 703 (6 Cir. 1960), ("The word 'forgery' is commonly defined as the false making or materially altering, with intent to defraud, of any writing, which, if genuine, might apparently be of legal efficacy or the foundation of a legal liability."); *Marteney v. United States,* 216 F.2d 760, 763 (10 Cir. 1954), *cert. denied,* 348 U.S. 953, 75 S.Ct. 442, 99 L.Ed. 745 (1955), ("The words [falsely made and forged] relate to genuineness of execution and not falsity of content.") [13]

▮ In the present case, the district court was of the opinion that Everston, in fact, *made* a false writing because "the individual who drafted the instrument in a practical sense was Everston, although he employed the computer as the instrumentality by which the checks were physically drawn." [14] We think, however, that the acts of Everston did not constitute the *making* of a *false writing,* but rather amounted to the creation of a writing which was genuine in execution but false as to the statements of fact contained in such writing.[15] The distinction is critical to the sufficiency of the indictment.

"In criminal cases the great weight of authority holds false statements in or

fraudulent execution of otherwise valid instruments not to be forgery within its common law or unexpanded meaning. *Greathouse v. United States,* 4 Cir., 170 F.2d 512, 514; *United States v. Brown,* 2 Cir. 1957, 246 F.2d 541; *Marteney v. United States,* 10 Cir. 1954, 216 F.2d 760; 41 A.L.R. 229, supplemented, 49 A.L.R. 1529, 51 A.L.R. 568."

*First National Bank of South Carolina v. Glenn Falls Ins. Co.,* 304 F.2d 866, 870 n. 1 (4 Cir. 1962).

The district court was of the opinion that the facts did not warrant the conclusion that false statements appeared on the face of the checks issued by Inglis to "A.L.E. Jones".[16] We cannot agree. The checks state that the designated amount is payable "to the order of A.L.E. Jones," and implicit in such an unconditional order was the existence of an obligation running from Inglis, Limited, to the payee. There was, of course, no such obligation, but as the result of Everston's misconduct the accounting department of Inglis was defrauded into believing that the company owed a bona fide obligation to "A.L.E. Jones" and, accordingly, issued a *genuine instrument containing a false statement of fact as to the true creditor.*[17]

▮ We recognize that, at common law, one need not have physically counter-

---

**13.** *See also* R. Anderson, 2 Wharton's Criminal Law and Procedure § 634 at 412–13 (1957); *Cunningham v. United States,* 272 F.2d 791 (4 Cir. 1959); *United States v. Smith,* 262 F. 191 (7 Cir. 1920).

**14.** 414 F.Supp. at 968.

**15.** There is, of course, a valid and recognized distinction between the false making of a writing and the making of a false writing. *See United States v. Davis,* 231 U.S. 183, 34 S.Ct. 112, 58 L.Ed. 177 (1913); *United States v. Staats,* 8 How. 41, 49 U.S. 41, 12 L.Ed. 979 (1850); *Wright v. United States,* 172 F.2d 310 (9 Cir. 1949); *United States v. Mulligan,* 59 F.2d 200 (2 Cir. 1932).

**16.** The district court stated that "[t]he only words on the checks that can in any way be characterized as false are 'A.L.E. Jones,' and those words make no assertion, either true or false; their only falsity lies in the fact that their presence on the instruments was unauthor-

ized." 414 F.Supp. at 968. As noted above, we cannot agree with the district court's view on this point.

**17.** Although the district court correctly notes that reference to the "imposter doctrine" as found in the civil arena would be "irrelevant in the context of a criminal prosecution \* \*." 414 F.Supp. at 971 n. 9, we think the imposter/forger distinction is helpful in deciding that the facts of the present case do not amount to forgery. *See Atlantic National Bank of Jacksonville v. United States,* 250 F.2d 114 (5 Cir. 1957). *See also United States v. Bank of America Nat. Trust & Sav. Ass'n,* 274 F.2d 366 (9 Cir. 1959); *United States v. Union Trust Co.,* 139 F.Supp. 819 (D.Md.1956); Annot., 81 A.L.R.2d 1365 (1962). (The annotation draws an interesting distinction between the "imposter/forger" rule and the "defrauder/forger" rule. The case at bar involves the latter doctrine. *See* 81 A.L.R.2d at 1368.)

feited an instrument to be convicted of forgery, see *In re Count De Toulouse Lautrec,* 102 F. 878 (7 Cir. 1900).[18] However, we note that in those circumstances the issuance of the instrument purporting to have legal efficacy *"was neither intended nor issued as such by the purported maker."* *Id.* at 881. (emphasis added). In the present case, the purported maker, Inglis, *issued* the check and "the instrument [was] of such nature that if not voidable for the defendant's fraud it could have some legal or prejudicial effect upon the signer." R. Anderson, 2 Wharton's Criminal Law and Procedure § 611, at 378 (1957). We conclude that the crime herein was a fraud or false pretense, and not forgery.

Decisional support for the proposition that the alteration of supporting documents giving rise to the issuance of a bona fide instrument amounts to the crime of false pretenses is found in the Ninth Circuit's decision in *Lemke v. United States,* 211 F.2d 73, 14 Alaska 587 (9 Cir.), *cert. denied,* 347 U.S. 1013, 74 S.Ct. 866, 98 L.Ed. 1136 (1954). In *Lemke* the court was faced with a situation wherein the manager of a cafeteria, who had previously purchased vegetables from a truck farmer, attempted to have the farmer make out invoices showing the sale to the cafeteria of vegetables which had never been delivered. The manager planned to sign and approve the slips and present them for payment. Under such circumstances the invoices were treated as vouchers authorizing payment to the sellers. Thus, "in ordinary course, the bookkeeper would at the end of the month add the amounts of these vouchers and write a check for the total and deliver it * * *." 211 F.2d at 74. The Ninth Circuit held that

"[t]he evidence here was sufficient to show that Lemke had put in motion a procedure which, had it not been interrupted in consequence of the intervention by the officers, would have resulted in $60 being paid by check to Elbert for vegetables never delivered or intended to be delivered. Had Lemke's plan been consummated the Civilian Mess would have been defrauded in consequence of Lemke's false pretenses."

*Id.* at 75. Just as the facts before us indicate that the alteration of supporting documents generated a valid security, so also in *Lemke* the falsely made invoices would have resulted in the issuance of a valid check. In each instance the pattern of conduct was designed to defraud the company through the use of false pretenses.

Since we conclude that the checks did not fall within the exclusion of the statutes as forgeries, the order of the district court dismissing the indictment must be reversed.

*REVERSED.*

---

18. The Seventh Circuit has capsulated the factual contours of its Lautrec decision thusly:

In *Lautrec* a printer retained as samples of his work several interest coupons, the originals of which had been validly issued in connection with certain corporate bonds. The petitioner obtained some of these samples and, although knowing that they were not genuine obligations of the issuing corporations, negotiated them. The petitioner argued that he was not guilty of common law forgery because: 1) the coupons had been lawfully printed and retained; 2) he had obtained the coupons legitimately from a person with authority to distribute them; and 3) he was able to negotiate the coupons without altering them in any way. The court rejected this argument, concluding that forgery was committed when

the accused adopted the otherwise innocent work of the printer for the purpose of defrauding purchasers by selling as genuine an instrument which purported to have legal efficiency, but was neither intended nor issued as such by the purported maker.

102 F. at 881. *See also Gilbert, supra,* 370 U.S. at 658, 82 S.Ct. at 1404 (where " 'falsity lies in . . . the genuineness of execution,' it is . . . forgery").

*United States v. Johnson,* 504 F.2d 622, 625–26 (7 Cir. 1974) (footnotes omitted).