**UNITED STATES of America**

v.

**Lewis Samuel SCHULMAN.**

**Crim. No. S–94–0266.**

United States District Court,
D. Maryland,
Northern Division.

Jan. 26, 1995.

812

Lynne A. Battaglia, U.S. Atty., D.Md., and Barbara S. Sale, Asst. U.S. Atty., Baltimore, MD, for the Government.

Charles G. Bernstein, Bernstein & Sakellaris, Baltimore, MD, for defendant.

## MEMORANDUM AND ORDER

MALETZ, Senior District Judge, sitting by designation.

On January 11, 1995, the defendant, Lewis Samuel Schulman, was convicted by a jury of four counts of bank fraud, in violation of 18 U.S.C. § 1344. Presently pending before the court is the defendant's motion for judgment of acquittal pursuant to Rule 29(b) of the Federal Rules of Criminal Procedure.[1] Having considered the parties' respective memoranda, and having heard oral argument on the motion, the court is now prepared to rule. For the reasons explained below, the motion will be denied.

Background

The facts giving rise to this prosecution are largely undisputed. On April 7, 1994, the defendant endorsed and deposited a $250,000 check into his personal savings account at the Greenspring branch of the Maryland National Bank.[2] The check, which was made payable to the defendant, purported to be drawn on a checking account of a Miami, Florida, company by the name of APPCO.

Four days later, on April 11, 1994, the defendant deposited a $350,000 check into the same account. This check purported to be drawn on an account of the Biltmore Hotel Company at the Bank of America in Los Angeles. Like the previous check, it was made payable to the defendant personally and was endorsed by him.

On April 13, 1994, the defendant returned to his bank and conducted several transactions. Although the APPCO check had not yet cleared the drawee bank in Jacksonville, Florida, the five-day hold which Maryland National Bank places on checks had passed. Accordingly, the defendant was permitted to transfer $36,370 into two new accounts that

---

1. The defendant initially made this motion at the close of all of the evidence, at which time the court reserved decision.

2. The defendant's monthly balances on this account had previously averaged less than $2,000.

he opened up in the names of himself and his parents. He also transferred $5,500 to an account of his father's to cover a bad check that he had previously written to him. Most significantly, the defendant withdrew $8,500 in cash and caused the wire transfer of $200,-000 to a New Jersey bank account of the Sands Hotel and Casino for further credit to his own "front money" account at the Sands.

Upon concluding these transactions, the defendant travelled by limousine to the Sands where he began to gamble. Officials at the defendant's bank, however, had apparently grown suspicious and notified the Sands that there might be a problem with the defendant's account. The defendant was then interviewed by two officers of the New Jersey State Police assigned to the Division of Gaming Enforcement. In this interview, which was tape recorded and played to the jury, the defendant represented that he was a buyer and seller of merchandise and that the two checks in question had been sent to him by a customer, Joe Zivin, with whom he had previously done business. Government Exhibit # 7A at 7.[3] According to the defendant, Zivin provided the APPCO check as payment for Jordache jeans. *Id.* at 9. The defendant stated that he had already placed his order for these jeans with Sam Shahar, Jordache's vice president. Likewise, the defendant asserted that the Biltmore check was for "promotional stuff" such as "T-shirts with the name on it." *Id.* at 14.

### The Indictment

On July 7, 1994, the Grand Jury for the District of Maryland returned a four-count indictment against the defendant. Count one charged that he knowingly executed a scheme and artifice to defraud Maryland National Bank by depositing a "counterfeit" check, purported to be drawn on an "APPCO" account at the First Union Bank of Florida in the amount of $250,000. In identical language, the defendant was charged in count two with depositing a "counterfeit"

check drawn on a Biltmore Hotel account. Count three charged the defendant with knowingly executing a scheme and artifice to defraud Maryland National Bank by wire transferring the $200,000 from his personal account to the Sands Hotel. Likewise, count four related to his withdrawal of $8,500 in cash.

### The Trial

In addition to providing the tape of the defendant's conversation with the New Jersey police, the government produced at trial representatives of both APPCO and the Biltmore Hotel. Emma Maestre, the comptroller of the parent company of APPCO, testified that APPCO is an insurance finance company, having no dealings in jeans, Jordache or otherwise. As far as Ms. Maestre was aware, APPCO had done no business with either the defendant or the alleged Mr. Zivin. Ms. Maestre further testified that the APPCO check of $250,000 was a replica or copy of a true check drawn on APPCO's bank account, that had been made payable to the Florida No–Fault Insurance Agency in the amount of $19.85. However, since the true check was issued in error, it never actually left APPCO's premises. Ms. Maestre was unable to provide any explanation as to who actually counterfeited the check.

Lorita Chan, the assistant comptroller for the Biltmore Corporation, testified that Biltmore also had not done any business with the defendant or Mr. Zivin. She further testified that the bogus check was drawn on a "concentration" or "depository" account, upon which no legitimate checks have ever been issued.[4] Like Ms. Maestre, Ms. Chan also had no information regarding the creator of the phony Biltmore check.

The government also called as a witness, Sam Shahar. Mr. Shahar explained that he is not a vice president of Jordache, but rather a principal of a company that holds the license to sell Jordache merchandise in Rus-

---

**3.** The defendant did not make entirely clear in his statement to the police that it was Zivin who sent the Biltmore check. The defendant simply referred to the provider of that check as "the guy." Government Exhibit # 7A at 14. The defense position, however, as expressed by counsel during closing argument and in his memoran-

dum to this court, is that Zivin provided the defendant with both checks. *See* Defendant's Memorandum at 6.

**4.** Ms. Chan testified that Biltmore had several other accounts from which payments were made.

sia. Mr. Shahar testified that he, in fact, had met with the defendant in March of 1994, at which time the defendant indicated that he had a client in Russia who was interested in purchasing $10 million worth of Jordache jeans. Mr. Shahar, however, did not recall any proposed transaction involving $250,000 of jeans to be sold by the defendant to a customer in the United States.

### The Defendant's Motion

The defendant seeks a judgment of acquittal on two grounds. First, with respect to count two of the indictment, the defendant asserts that the Biltmore check in question is not "counterfeit" as charged in the indictment, since there is no genuine Biltmore checks for the account on which it is drawn. The defendant submits that while the check may be forged, and/or falsely made, it is not a counterfeit. Second, as to each of the counts of the indictment, the defendant contends that insufficient evidence was presented for a reasonable juror to conclude beyond a reasonable doubt that the defendant knew either of the checks to be counterfeit.

### Discussion

#### Is the Biltmore check a "counterfeit"

■ The defendant primarily bases his contention that the Biltmore check is not a counterfeit on the case of *Pines v. United States*, 123 F.2d 825 (8th Cir.1941). In *Pines*, the Eighth Circuit, in distinguishing the acts of "falsely making," "forging," "altering," and "counterfeiting" stated that "manifestly the words altering and counterfeiting could refer only to a crime based upon a preexisting genuine instrument." *Id.* at 828. To the extent, however, that this language in *Pines* suggests that the crime of counterfeiting requires there to be a specific genuine counterpart that has been copied by the alleged counterfeiter, it is plainly contrary to the law of this Circuit.

It is well settled in the Fourth Circuit that the terms falsely made, forged, altered and counterfeit are "substantially synonymous

and refer to the crime of forgery." *United States v. Jones*, 553 F.2d 351, 354 (4th Cir.), *cert. denied,* 431 U.S. 968, 97 S.Ct. 2928, 53 L.Ed.2d 1064 (1977); *Greathouse v. United States*, 170 F.2d 512, 514 (4th Cir.1948); *United States v. Wright*, 704 F.Supp. 613, 614 (D.Md.1989). In this regard, the Fourth Circuit, following the Supreme Court, as well as the common law, has defined forgery as "the fraudulent making or alteration of a writing to the prejudice of another man's right ..." *United States v. Jones*, 553 F.2d at 354 (*quoting Gilbert v. United States*, 370 U.S. 650, 657 n. 10, 82 S.Ct. 1399, 1403 n. 10, 8 L.Ed.2d 750 (1962)) (*quoting* Blackstone, *Commentaries* (Christian E.D.1809), 247–248). Similarly, in a case involving a charge of counterfeit currency, the Fourth Circuit held that the term counterfeit means "imitated, simulated, *feigned* or *pretended,*" so as to fool an "honest, sensible and unsuspecting person of ordinary observation and care." *United States v. Ross*, 844 F.2d 187, 189 (4th Cir.1988) (emphasis added) (*quoting United States v. Lustig*, 159 F.2d 798, 802 (3d Cir. 1947)), *rev'd on other grounds*, 338 U.S. 74, 69 S.Ct. 1372, 93 L.Ed. 1819 (1949).

Consistent with the above definitions, the Fourth Circuit has made clear that forgery and counterfeiting may occur in the absence of a genuine original that has been copied. In *Cunningham v. United States*, 272 F.2d 791 (4th Cir.1959), for example, the court held that the signing of a fictitious name to a check constituted forgery. Plainly if it is forgery or counterfeiting to sign to a check a name that has no basis in reality, then it is also forgery or counterfeiting to create a fictitious check that has no actual counterpart. While the phony Biltmore check may not have been copied from a genuine original, it nevertheless is a feigned falsely made check that plainly had the capacity to fool sensible and unsuspecting persons of ordinary observation and care. Accordingly, under Fourth Circuit law it is a counterfeit.[5]

In support of his contention that the Biltmore check is not a counterfeit, the defen-

---

**5.** Alternatively, even if a requisite element of counterfeiting is a genuine original, such a requirement has been satisfied in this case. As the parties acknowledged at oral argument, a fair inference from the testimony of Ms. Chan is that

the Biltmore Hotel does have checks on at least some of its accounts. Accordingly, the phony Biltmore check can clearly be viewed as a copy of a genuine Biltmore check, albeit one with different account numbers.

dant points out that in the *Ross* opinion cited above, the Fourth Circuit specifically stated that the word "counterfeit connotes a similitude without which there is no counterfeit." *United States v. Ross*, 844 F.2d at 189. The defendant contends that in order for there to be a "similitude" there must be a genuine from which the check was copied. The defendant further submits that while there may be checks from other Biltmore accounts, there was no evidence that the bogus Biltmore check bore a resemblance to any of them.

In the court's view, the defendant misunderstands the Fourth Circuit's use of the term similitude. The test employed by the Fourth Circuit for similitude is, as stated above, whether the article in question would fool an "honest, sensible and unsuspecting person of ordinary observation and care." *United States v. Ross*, 844 F.2d at 189. As can be seen from the undisputed facts of this case, a bogus check can fool even trained and experienced bank personnel simply by bearing a similitude to what may be considered the general class or universe of checks. The defendant posits no authority to support his contention that a phony article can only be considered a counterfeit if it resembles a specific genuine counterpart, and such a requirement would plainly be inconsistent with the test utilized by the Fourth Circuit. Since the feigned Biltmore check was able to fool sensible persons of ordinary observation and care, it is a counterfeit.

*The Knowledge Requirement*

█ An essential element of each of the four counts of the indictment is that the defendant knew that the checks were counterfeit at the time that he deposited them. The government's primary proof of this element was the defendant's tape recorded interview with the New Jersey police. Over the defendant's objection, the government argued to the jury during closing argument, that the defendant's statements to the police were false and that the jury could therefore infer that the defendant had a consciousness of guilt at the time he made them. In overruling the defendant's objection, which was made at a charging conference prior to closing arguments, the court held that the jury could reasonably conclude that the defendant's statements to the police were false. Accordingly, the court also provided the jury with an instruction on false exculpatory statements and consciousness of guilt.[6] The defendant continues to contend that his statements to the police were not false and that the court's ruling was in error.

The defendant submits that while the government may have proven that Joe Zivin was not connected with APPCO or Biltmore, there was no evidence that "Zivin did not convincingly hold himself out to Schulman as the genuine article." Defendant's Memorandum at 6.[7] The defendant is mistaken. As discussed above, contrary to the defendant's assertion that he had already placed Zivin's alleged order for $250,000 worth of jeans with Sam Shahar, Mr. Shahar testified that he had no recollection of any such transaction.[8] In addition, rather than providing any funds to Mr. Shahar for this alleged order, the defendant used the money from the APPCO check, as soon as it became available, to

---

**6.** The instruction provided as follows:

You've heard testimony that the defendant made certain statements outside the courtroom to law enforcement authorities in which the defendant claimed that his conduct was consistent with innocence and not with guilt. The government claims that these statements in which he attempted to exonerate or to exculpate himself are false.

If you find that the defendant gave a false statement or statements in order to divert suspicion from himself, you may, but are not required to, infer that the defendant believed that he was guilty. You may not, however, infer on the basis of this alone, that the defendant is, in fact, guilty of the crime for which he is charged.

Whether or not the evidence as to a defendant's statements shows that the defendant believed that he was guilty, and the significance, if any, to be attached to any such evidence, are matters for you, the jury, to decide.

**7.** As the defendant implicitly acknowledges in his memorandum, the unstated, yet undeniable, upshot of his statement to the police was that he was the unwitting victim of Joe Zivin.

**8.** The defendant's statement is also inconsistent with the fact that Shahar does not even have a right under his license from Jordache to sell Jordache merchandise in the United States.

go gambling. The defendant's contention that Zivin is a counterfeiter and a con man is also inconsistent with his assertion to the police that Zivin was a regular client to whom he had previously delivered merchandise. Finally, the defendant's explanation that he is the innocent victim of Joe Zivin simply defies common sense. A necessary, but unstated, component of the defendant's statement to the police is that Joe Zivin went to the trouble of counterfeiting a $350,000 Biltmore check in the hopes of tricking the defendant into providing him with Biltmore Hotel T-shirts. Plainly the jury was entitled to reject this explanation as preposterous and to instead find that the defendant had provided the police with a false story. *See United States v. Littlefield,* 840 F.2d 143, 149 (1st Cir.) (Admission of false exculpatory statement is proper where its "very implausibility suggests that it was created to conceal guilt...."), *cert denied,* 488 U.S. 860, 109 S.Ct. 155, 102 L.Ed.2d 126 (1988); *United States v. Smith,* 680 F.2d 255, 260 (1st Cir. 1982) ("In light of all of this, Smith's innocent hitchhiking story is inherently unbelievable and we perceive of no more reason for being taken in by it than was the jury."), *cert denied,* 459 U.S. 1110, 103 S.Ct. 738, 74 L.Ed.2d 960 (1983).

The defendant also contends that even if his statements to the police were false, and even if the jury could therefore properly conclude that he had a consciousness of guilt, the statements still do not prove that he knew that the checks were counterfeit, as opposed to being stolen or otherwise wrongfully in his possession. Because the indictment in this case specifically charges that the defendant committed bank fraud by depositing counterfeit checks, the defendant submits that there must be evidence from which the jury could conclude that he knew the checks were counterfeit.

In support of this argument, the defendant relies on this court's opinion in *United States v. Maura,* 778 F.Supp. 835 (D.Md.1991). In *Maura,* Judge Harvey held that under an indictment, substantially similar to the one in the case at bar, the government was required to prove that the defendant therein knew that the check which he had deposited was counterfeit.[9] Judge Harvey additionally held that while the defendant's false exculpatory statements, and other circumstantial evidence, was clearly sufficient to prove that the defendant knew that the check was wrongfully in his possession, this evidence did not prove that he knew that it was counterfeit. *Id.* at 837.

*Maura,* however, has been distinguished by the Fourth Circuit on a ground clearly applicable to this case. In *United States v. Musa,* 998 F.2d 1011, No. 92–5259 1993 U.S.App. Lexis 17087 (4th Cir.1993), *(per curiam),* the Fourth Circuit pointed out that the counterfeit instrument in *Maura* was a "bearer" check, whereas the check at issue in *Musa,* like the checks at issue here, was "drawn in favor of a specific individual." *Id.* at 4. On this basis, the court distinguished *Maura* and found there to be sufficient proof of the defendant's knowledge that the check therein was counterfeit.[10] *Id.*

That the checks in this case were made payable to the defendant personally is indeed significant. This fact plainly indicates that the defendant had a direct relationship with the individual who counterfeited the checks, assuming of course that it was not simply the defendant himself. When this factor is considered along with the powerful evidence of the defendant's consciousness of guilt discussed above, it is clear that the jury had a firm basis from which to conclude that the defendant knew exactly how the checks at issue were created.

Accordingly, for all of the foregoing reasons, the defendant's motion for a judgment of acquittal is denied.

---

**9.** Consistent with *Maura,* the court here specifically instructed the jury that in order to convict the defendant, on any of the counts of the indictment, it must find beyond a reasonable doubt that the defendant knew that the checks in question were counterfeit, as opposed to being forged, stolen, or otherwise wrongfully in his possession.

**10.** The Fourth Circuit in *Musa* additionally distinguished *Maura* on the basis of Musa's opening of a bank account in a phony name. *Id.*